# UNITED STATES OF AMERICA
## MERIT SYSTEMS PROTECTION BOARD

DENNIS T. MANGANO,
          Appellant,

      v.

DEPARTMENT OF VETERANS
    AFFAIRS,
          Agency.

DOCKET NUMBER
SF-1221-04-0234-B-9

DATE: October 31, 2014

# THIS FINAL ORDER IS NONPRECEDENTIAL[1]

Barbara Ann T. Konno, Esquire, Palo Alto, California, for the agency.

Joseph V. Kaplan, Esquire, Washington, D.C., for the appellant.

## BEFORE

Susan Tsui Grundmann, Chairman
Anne M. Wagner, Vice Chairman
Mark A. Robbins, Member
Vice Chairman Wagner issues a separate, dissenting opinion.

## FINAL ORDER

¶1      The appellant has filed a petition for review of the initial decision, which denied the appellant's request for corrective action in this individual right of action (IRA) appeal. Generally, we grant petitions such as this one only when: the initial decision contains erroneous findings of material fact; the initial

---

[1] A nonprecedential order is one that the Board has determined does not add significantly to the body of MSPB case law. Parties may cite nonprecedential orders, but such orders have no precedential value; the Board and administrative judges are not required to follow or distinguish them in any future decisions. In contrast, a precedential decision issued as an Opinion and Order has been identified by the Board as significantly contributing to the Board's case law. *See* 5 C.F.R. § 1201.117(c).

decision is based on an erroneous interpretation of statute or regulation or the erroneous application of the law to the facts of the case; the judge's rulings during either the course of the appeal or the initial decision were not consistent with required procedures or involved an abuse of discretion, and the resulting error affected the outcome of the case; or new and material evidence or legal argument is available that, despite the petitioner's due diligence, was not available when the record closed.  *See* Title 5 of the Code of Federal Regulations, section 1201.115 (5 C.F.R. § 1201.115).  After fully considering the filings in this appeal, and based on the following points and authorities, we conclude that the petitioner has not established any basis under section 1201.115 for granting the petition for review.  Therefore, we DENY the petition for review.  We MODIFY the initial decision to address some of the appellant's arguments related to the strength of the agency's motive to retaliate and whether similarly-situated nonwhistleblowers were treated differently than the appellant.  We conclude, however, that the administrative judge correctly found that the agency proved by clear and convincing evidence that it would have terminated the appellant based on the suspension of his faculty appointment in the absence of his whistleblowing activity.  Accordingly, we find that the appellant is not entitled to corrective action.

### DISCUSSION OF ARGUMENTS ON REVIEW

The appellant, a part-time Physician, Anesthesia Service, and a chapter 38 employee, was removed from his position based on two charges:  (1) failure to hold an active faculty position with the agency hospital's affiliate, the University of California, San Francisco (UCSF) Medical School,[2] which was required to

---

[2] The appellant's faculty appointment was initially suspended effective June 1, 1999, and it was based on allegations of harassment and intimidation of colleagues, extensive and unauthorized use of University resources to financially benefit a non-University entity, misrepresentations to University officials, and the use of the appellant's position and the name of the University to commit fraud against certain corporate research sponsors.  MSPB Docket No. SF-1221-04-0234-W-1, Initial Appeal File (W-1 IAF),

supervise and manage UCSF residents; and (2) misconduct towards other employees. W-1 IAF, Tab 5, Subtab 4g. He filed an IRA appeal, claiming that his May 25, 2001 termination, among other actions, was taken in retaliation for his 1997 disclosure to the agency's Medical Center Director that there was potentially serious animal-to-human-infectious cross-contamination use of surgical patient-care equipment in animals and re-use in patients. W-1 IAF, Tab 1, Subtab L. This is the third time that this matter is before the Board. *See Mangano v. Department of Veterans Affairs*, [109 M.S.P.R. 658](#) (2008); *see also Mangano v. Department of Veterans Affairs*, [104 M.S.P.R. 316](#) (2006). In its most recent remand order, the Board noted that further adjudication was required on the issue of whether the agency proved by clear and convincing evidence that it would have terminated the appellant based on the suspension of his faculty appointment in the absence of his whistleblowing, and it directed the administrative judge to allow the appellant to develop and present evidence regarding the strength of the agency's evidence and the strength of the motive to retaliate by agency officials. *Mangano*, [109 M.S.P.R. 658](#), ¶¶ 46-47. The Board noted that, if the agency did not prove by clear and convincing evidence that it would have terminated the appellant for the suspension of his faculty appointment in the absence of his whistleblowing, the administrative judge may decide the remaining issues—including whether the agency proved that it would have terminated the appellant based on the misconduct charge in the absence of his whistleblowing—in the most efficient manner. *Id.*, ¶ 48.

¶3     After holding a third hearing, *see* Hearing Transcript (HT) III, the newly assigned administrative judge issued a 31-page initial decision, concluding that the agency established by clear and convincing evidence that it would have

Tab 5, Subtab 4x. The suspension was stayed pending an appeal, and the California trial court and court of appeals affirmed the suspension. *See id.*, Subtabs 4k, 4s. The appellant began serving the suspension on May 24, 2001, and his termination was effected the following day. *See id.*, Subtabs 4g-4h.

removed the appellant based on the suspension of his faculty appointment in the absence of his whistleblowing disclosures. MSPB Docket No. SF-1221-04-0234-B-9, Initial Appeal File (B-9 IAF), Tab 15, Initial Decision (ID). In accordance with the Board's remand order, the administrative judge did not address the misconduct charge, and he denied the appellant's request for corrective action. *See* ID.[3] The appellant, with permission, filed a 59-page petition for review, the agency filed a response, and the appellant filed a reply brief. Petition for Review (PFR) File, Tabs 6, 8-9.

¶4      The issue before the Board is whether the administrative judge properly determined that the agency proved that it would have terminated the appellant based on the suspension of his faculty appointment in the absence of his whistleblowing. In making this determination, the Board will consider the following factors: the strength of the agency's evidence in support of its action; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated. *Carr v. Social Security Administration*, 185 F.3d 1318, 1323 (Fed. Cir. 1999). The administrative judge found that: (1) the evidence relied upon by the agency to support the charge related to the suspension of the appellant's faculty appointment was "very strong"; (2) the record contained "little or no evidence" that the agency's decision to terminate the appellant based on the suspension of the faculty appointment was motivated by retaliatory animus; and (3) the appellant was not disparately treated compared to similarly-situated nonwhistleblowers. ID at 11-31. On review, the appellant

---

[3] The administrative judge also noted in the initial decision that the appellant indicated that he was withdrawing his claim for consequential damages arising from any previously rescinded agency actions. ID at 8; *see* HT III at 4; W-1 IAF, Tab 18, Subtab I (notice of rescission).

essentially argues that the administrative judge improperly analyzed these elements.

¶5        Regarding the strength of the agency's evidence, we have considered the appellant's argument that the administrative judge ignored the Board's prior directives when he allowed the agency to present a new case-in-chief on the issue of whether the suspension of the appellant's faculty appointment made it impractical to retain him.  PFR File, Tab 6 at 11-14.  The administrative judge rejected this argument below.  *See* B-9 IAF, Tab 10 at 4 n.1 (explaining that the Board's remand order set forth that "a full and proper evaluation of whether the agency has met its burden . . . has never been made," and, even if this were not the case, a new and complete review of these questions was necessary because the case was reassigned to a new administrative judge after remand).

¶6        It is a well-established rule that an administrative judge has broad discretion to control the proceedings before him.  *Fritz v. Department of Health & Human Services*, 87 M.S.P.R. 287, ¶ 15 (2000); *see* 5 C.F.R. § 1201.41.  Given the totality of the circumstances, including the complicated and complex litigation involved in this matter, the administrative judge's recent reassignment of this case, the fact that the agency ultimately bears the burden on the issue of whether it still would have removed the appellant absent his whistleblowing activity, and the lack of evidence that the Board intended to prohibit the agency from presenting on remand, we find no abuse of discretion in this regard.

¶7        The appellant also asks the Board to adopt the rule that the post hoc rationale offered by the agency is not entitled to consideration.  PFR File, Tab 6 at 15-18; *see Santiago-Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 56 (1st Cir. 2000) ("Another method of establishing pretext is to show that Centennial's nondiscriminatory reasons were after-the-fact justifications, provided subsequent to the beginning of legal action.").  He also requests that the Board adopt and apply the rule that shifting explanations for personnel actions are unworthy of belief and constitute illegal reprisal for whistleblowing.  PFR File,

Tab 6 at 19-22; *see, e.g.*, *Hudson v. U.S. Postal Service*, Appeal No. 0120093843, 2011 WL 2433178, at * 7 (E.E.O.C. June 6, 2011) ("The credibility of an employer's explanation can be called into question if it is unduly vague, appears to be an after-the-fact explanation or appears otherwise fabricated (e.g., the explanation shifts, or inconsistent reasons are given)."). The appellant asserts that both of these rules are applied in the context of discrimination claims and these rules should apply with equal force in the context of whistleblower claims. PFR File, Tab 6 at 15-22. In response, the agency contends that, by applying a rule regarding post hoc rationale, the Board would be limiting or prohibiting testimony or evidence in violation of the U.S. Court of Appeals for the Federal Circuit's (Federal Circuit) holding in *Whitmore v. Department of Labor*, 680 F.3d 1353 (Fed. Cir. 2012). PFR File, Tab 8 at 15.

¶8        We agree with the agency that strictly applying the post hoc rationale rule would be at odds with the Federal Circuit's instruction in *Whitmore* that the Board must "evaluate all of the pertinent evidence in determining whether an element or a claim or defense has been proven adequately." *See Whitmore*, 680 F.3d at 1368.[4] Moreover, a witness's changing explanations are already a factor to be considered by an administrative judge in assessing credibility. *See Hillen v. Department of the Army*, 35 M.S.P.R. 453, 458 (1987) (explaining that an administrative judge may consider a witness's prior inconsistent statements in resolving credibility issues).

¶9        We also are not persuaded by the appellant's argument that the administrative judge erroneously held that the agency proved by clear and convincing evidence that it was impractical to retain the appellant after his faculty appointment was suspended. PFR File, Tab 6 at 22-40. In this regard, the

---

[4] The administrative judge considered and rejected the appellant's argument that the Medical Center Director's post hoc rationale regarding the practicality of retaining the appellant after his faculty appointment was suspended was unworthy of deference or credence, ID at 14, and we discern no error with his analysis in this regard.

appellant asserts that the administrative judge erroneously found that: (1) Dr. E.B., who held a locum tenens (or temporary) staff physician appointment, was supervising residents; (2) it would be impractical to schedule the appellant for surgeries; and (3) it would be impractical for the appellant to perform duties other than surgery. *Id*. He also contends that the administrative judge failed to consider that: (1) at least 50% of surgeries were performed without residents; (2) the appellant had limited clinical hours, and thus, he would only need to be scheduled for surgery less than 1 day per week; (3) surgery was only 40% of the appellant's duties of his part-time schedule; (4) Dr. B.C., the appellant's supervisor, and the individual against whom the appellant's whistleblowing disclosure was made, intentionally misled the Board about how many daily surgeries were typically scheduled; and (5) Operating Room 7 was available for the appellant's surgeries. *Id*. The appellant also argues that the Board need not give deference to the administrative judge's credibility determinations because they were based on logic, not witness demeanor. *Id*. at 22-23.

¶10    We disagree with the appellant's assertion that the administrative judge did not mention all of the cited evidence. To the contrary, the administrative judge acknowledged that the appellant was a part-time physician, whose appointment equated to approximately 30 hours per 2-week period. ID at 2, 20. The administrative judge also noted the appellant's testimony that more than half of his time was spent working as a "researcher/administrative," that he could perform other duties, and that there was a seventh operating room in which he could have worked. The administrative judge also discussed Dr. B.C.'s testimony regarding how staffing patterns were scheduled. ID at 16-19. It is true that the administrative judge did not specifically note that at least 50% of surgeries were performed without residents, nor did he discuss how many daily surgeries were typically scheduled, or that the appellant, by virtue of his part-time schedule and his various other duties, would only need to be scheduled for surgery approximately 1 day per week. We have considered this evidence, *see Whitmore*,

680 F.3d at 1368, but conclude that the administrative judge properly found that the agency proved by clear and convincing evidence that it was impractical to retain the appellant once his faculty appointment was suspended, ID at 11-16. *See, e.g.*, *Simmons v. Department of Agriculture*, 80 M.S.P.R. 380 ¶ 12 (1998) (finding that the Board had no authority to order a university to maintain the appellants in their university appointments, a prerequisite to their federal appointments).

¶11 As the administrative judge noted in the initial decision, the record supports a long-standing affiliation between the agency's medical center and UCSF, and that, pursuant to this affiliation, anesthesia physicians were jointly recruited and were required to hold faculty appointments and supervise residents. *See, e.g.*, W-1 IAF, Tab 5, Subtabs 4y, 4cc (affiliation agreements); MSPB Docket No. SF-1221-04-0234-W-4, Initial Appeal File (W-4 IAF), Tab 15, Subtab W (the appellant's 1996 proficiency report, which rated him "high satisfactory" in the category of educational competence, including effectiveness in teaching, monitoring, and coordinating education activities); HT III at 49 (affiliation agreement requires faculty members to teach residents), 213 (Chief of Staff explained that the agency's medical center and the University of California have a "very close affiliation," the affiliation agreement "probably began" in the 1960s, and that as a result of this affiliation, the agency's medical center and the University jointly recruit physicians). The suspension of the appellant's faculty appointment rendered him unable to supervise residents, made him unable to perform one of his duties, and led to his termination. *See, e.g.*, W-1 IAF, Tab 5, Subtab 4g (decision letter), Subtab 4v (the Chair of the Anesthesiology Department, upon learning of the suspension of the appellant's faculty appointment, stated that "in accord with the affiliation agreement, [the appellant] should no longer be allowed to participate in patient care teaching or research activities"), Subtab 4w (the University's notice to the medical center of the suspension of the appellant's faculty appointment stated that it was sharing the

information "so that appropriate staffing and other necessary administrative decisions could be implemented"); *see also* HT III at 30 (Dr. B.C. testified that there were no permanent staff anesthesiologists who did not have a faculty appointment), 213 (Chief of Staff testified that the agency's medical center "agree[d] to supervise [the University's] residents in a way that [the University] require[s] for their accreditation of programs"), 288 (Medical Center Director explained that, "[a]s a Staff Anesthesiologist, [the appellant] would need to be involved in residency, training, supervision, and oversight, and [without his faculty appointment,] he could no longer function in that capacity"). The record also reflects the practical difficulty in assigning an anesthesiologist to perform surgeries when that individual did not have a faculty appointment. *See, e.g.*, HT III at 32-33 (Dr. B.C. explained that it would be an "onerous burden" because, among other things, surgical assignments are revised during the day and it would be "quite difficult" to prevent a physician without a faculty appointment from having contact with residents), 226 (Chief of Staff stated that it would be "very, very awkward to have one anesthesiologist who had to be treated differently from all the others," noting that such differential treatment might cause a "morale problem" and describing how it would be "extremely hard to . . . keep [the appellant] from having to supervise a resident or be on-call with a resident").

¶12        The appellant correctly notes that the administrative judge did not make any explicit demeanor-based credibility determinations. PFR File, Tab 6 at 22-23. However, the administrative judge heard live testimony and his credibility determinations must be implicitly based on witness demeanor. *See Little v. Department of Transportation*, 112 M.S.P.R. 224, ¶ 4 (2009). The Board must give deference to an administrative judge's credibility determinations when they are based, explicitly or implicitly, on the observation of the demeanor of witnesses testifying at a hearing; the Board may overturn such determinations only when it has "sufficiently sound" reasons for doing so. *Haebe v. Department of Justice*, 288 F.3d 1288, 1301 (Fed. Cir. 2002). The appellant has not identified

any sufficiently sound reasons for overturning the judge's credibility determinations. Moreover, we are not aware of any prohibition on using "logic" to assist in the resolution of credibility issues. *See, e.g.*, *Confer v. Office of Personnel Management*, 111 M.S.P.R. 419, ¶ 17 (2009) ("[W]e do not find that the appellant's later statements about her general inability to function are logically inconsistent with her ability to work as a home health care aide shortly after her resignation, and these statements do not undermine her credibility."); *Hillen*, 35 M.S.P.R. at 458 (in resolving credibility disputes, an administrative judge may consider the contradiction of the witness's version of events by other evidence or its consistency with other evidence and the inherent improbability of the witness's version of events).

¶13    The administrative judge considered the entire record before him as well as the Board's instruction in the remand order and he made findings and credibility determinations based on that record. We discern no error with the administrative judge's conclusions regarding the strength of the agency's evidence. *See Crosby v. U.S. Postal Service*, 74 M.S.P.R. 98, 105-06 (1997) (finding no reason to disturb the administrative judge's findings when the administrative judge considered the evidence as a whole, drew appropriate inferences, and made reasoned conclusions); *see also Broughton v. Department of Health & Human Services*, 33 M.S.P.R. 357, 359 (1987) (same).

¶14    Regarding the existence and the strength of the agency's motive to retaliate, the Board previously found that Dr. B.C. was "involved" in the agency's decision to terminate the appellant, but that his "animosity and bitterness" towards the appellant does not resolve the issue of whether that animosity was related to the appellant's whistleblowing, and remanded this issue for further development of the record and adjudication. *Mangano*, 109 M.S.P.R. 658, ¶¶ 32, 34-35, 47. The administrative judge noted, among other things, that Dr. B.C.'s involvement with the faculty appointment suspension charge was "vanishingly small," both Dr. B.C. and the Medical Center Director testified that they did not speak to each

other regarding this charge, and the Medical Center Director said she did not know the appellant; the administrative judge concluded that there was "little or no evidence" that the agency's decision to terminate the appellant for the suspension of his faculty appointment was motivated by retaliatory animus. ID at 23-30.

¶15    On review, the appellant argues that the administrative judge "ignored" the law of the case doctrine concerning Dr. B.C.'s involvement and contends that the administrative judge violated the law when he found that the Medical Center Director did not have a retaliatory motive. PFR File, Tab 6 at 40-48. Under the law of the case doctrine, "a decision on an issue of law made at one stage of a proceeding becomes a binding precedent to be followed in successive stages of the same litigation." *King v. Department of the Air Force*, 119 M.S.P.R. 663, ¶ 30 (2013); *see Mangano*, 109 M.S.P.R. 658, ¶ 24. The Board's finding that Dr. B.C. was "involved" in the agency's decision to terminate the appellant does not require a finding that Dr. B.C. had a strong motive to retaliate against the appellant regarding the suspension of his faculty appointment. Indeed, the Board stated in its remand order that it was unable to decide the strength of Dr. B.C.'s motive to retaliate against the appellant for his whistleblowing based on the existing record. *Mangano*, 109 M.S.P.R. 658, ¶ 35.

¶16    We discern no error with the administrative judge's decision regarding the strength of Dr. B.C.'s motive to retaliate against the appellant concerning the suspension of his faculty appointment. Notably, there was no proposal notice, and thus, the Medical Center Director was the "sole" decision-maker on the termination. ID at 25. Based on the testimonial evidence in the record, Dr. B.C.'s involvement in the decision to terminate the appellant due to the suspension of his faculty appointment was at best de minimis, and thus, any animosity that he held based on the appellant's whistleblowing disclosure played little, if any, role in the termination decision. Moreover, the appellant does not allege on review, and the record does not reflect, that Dr. B.C. caused UCSF to

suspend the appellant's faculty appointment or that UCSF's suspension of his faculty appointment was in any way related to his whistleblowing activity.

¶17 We modify the initial decision, however, because the appellant correctly notes that the Board may find a retaliatory motive if an agency official, such as the Medical Center Director, knew of the disclosures and the disclosures reflected poorly on her. PFR File, Tab 6 at 43; *see Whitmore*, 680 F.3d at 1370-71 ("Those responsible for the agency's performance overall may well be motivated to retaliate even if they are not directly implicated by the disclosures, and even if they do not know the whistleblower personally, as the criticism reflects on them in their capacities as managers and employees."). Here, there is no dispute that the Medical Center Director was aware of the appellant's whistleblowing disclosures, HT III (Medical Center Director) at 353-54, and, if the appellant's disclosure was made public, it is likely that such disclosures would reflect poorly on her.

¶18 The appellant contends that the Medical Center Director's actions, including, among other things, refusing to meet with him to discuss his whistleblowing allegations, barring him from the premises without obtaining prior written notice, convening an Administrative Investigative Board (AIB) to look into his alleged misconduct, and expanding the scope of the AIB constitute strong evidence of retaliatory motive. PFR File, Tab 6 at 46; *see, e.g.*, W-1 IAF, Tab 5, Subtab 4p (bar notice); W-4 IAF, Tab 15, Subtab K (Medical Center Director convened an AIB to investigate the April 24, 2000 incident), Subtab L (clarification of the scope of the AIB). We note that the administrative judge considered and rejected some of these allegations. *See* ID at 29-30. We are not persuaded that the appellant's allegations warrant a different conclusion regarding the strength of the Medical Center Director's motive to retaliate against the appellant. Indeed, the Medical Center Director testified—credibly in our view—that she regarded the suspension of the appellant's faculty appointment as a "clear cut" issue and that she did not have any discretion or a need for "extensive

conversations with the supervisor" to proceed with the appellant's termination on this charge. HT III (Medical Center Director) at 298-301, 369-70. Her actions support this assertion. Indeed, upon learning that the appellant's faculty appointment was originally suspended in 1999, and before the incident that formed the basis for the misconduct charge ever occurred, the Medical Center Director immediately proceeded to terminate him. *See* W-1 IAF, Tab 5, Subtab 4u (May 26, 1999 termination of appointment).[5] As for the other actions identified by the appellant, one of the Medical Center Director's duties was to convene AIBs, HT III (Medical Center Director) at 305-06; indeed, she convened an AIB to investigate the allegations that the appellant made against Dr. B.C., *see* W-4 IAF, Tab 15, Subtab F. Moreover, as a result of an investigation into the whistleblowing allegations that the appellant made against Dr. B.C., the Medical Center Director issued a written admonishment or counseling to Dr. B.C. HT III (Medical Center Director) at 349-51. Based on our review of the record, we cannot conclude that these actions evince the Medical Center Director's retaliatory motive towards the appellant based on his whistleblowing. We therefore affirm as modified the administrative judge's analysis of this element, and we agree that the strength of the agency's motive to retaliate regarding the suspension of the appellant's faculty appointment was not very strong.

¶19 Finally, the appellant challenges the administrative judge's findings regarding alleged similarly-situated employees who were not whistleblowers. PFR File, Tab 6 at 48-53. For instance, the appellant contends that the administrative judge erroneously found that Drs. U.J. and G.F. were similarly situated and that the administrative judge also erred when he found that Dr. E.B. was not similarly situated. *Id*.; *see* ID at 30-31 (finding that, in every comparable situation where a jointly-accredited physician like the appellant lost his faculty appointment, the physician was notified that he would be terminated).

---

[5] The termination was stayed pending a resolution in the California courts. *See supra* n.2.

¶20       Regarding Dr. G.F., the appellant claims that the Medical Center Director's testimony, that she terminated Dr. G.F. after he lost his faculty appointment, constituted "surprise and unsupported testimony." PFR File, Tab 6 at 51; *see id.* at 55-56 (the appellant's affidavit). The appellant contends that the agency never mentioned Dr. G.F.'s termination in any of its discovery responses, he did not know Dr. G.F., and he was "totally unaware" that the agency would consider him as a comparator. *Id.* at 51 & n.31. To that end, the appellant provides a statement from Dr. G.F., made under penalty of perjury, which appears to contradict the Medical Center Director's testimony. *See id.* at 57-58.

¶21       Importantly, the appellant did not object to the Medical Center Director's testimony regarding Dr. G.F., HT III at 302-03, 336, nor did he seek additional time to submit rebuttal evidence. Moreover, he did not raise the "surprise" issue in his closing argument, which he submitted more than 1 month after the hearing. *See* B-9 IAF, Tab 14. In fact, the appellant did not raise this issue at any time prior to the initial decision being issued, nearly 8 months after the hearing; rather, he only claimed surprise after the administrative judge issued an initial decision finding Dr. G.F. to be similarly situated.

¶22       The Board has previously held that a rebuttal to "surprise" witness testimony does not constitute new evidence when the appellant did not request an extension of time in order to rebut the alleged surprise, and his posthearing brief did not allude to any surprise. *Wakeland v. National Transportation Safety Board*, 6 M.S.P.R. 37, 38-39 (1981). Similarly, we find that the appellant's statement from Dr. G.F. does not constitute new evidence. Moreover, evidence offered merely to impeach a witness's credibility is not generally considered new and material. *Bucci v. Department of Education*, 42 M.S.P.R. 47, 55 (1989). For these reasons, we do not consider Dr. G.F.'s statement on review.

¶23       The appellant also asserts that, contrary to Dr. B.C.'s testimony, Dr. U.J. was never advised that he was required to have a faculty appointment in order to maintain his position, and he refers to Dr. U.J.'s 2005 affidavit, which was in the

record below. PFR File, Tab 6 at 49-51. Dr. U.J. averred, in pertinent part, that he held a faculty appointment from 1995-2001 when he worked as a Staff Anesthesiologist, he was never advised that he was required to have a faculty appointment as a condition or requirement of his employment, and he was unaware of such a requirement. W-4 IAF, Tab 15, Subtab QQQ. The appellant properly notes that the administrative judge did not discuss this evidence in the initial decision. We have considered Dr. U.J.'s affidavit. Even if there were an inconsistency about whether Dr. B.C. told Dr. U.J. that he needed to have a faculty appointment to keep his position, there is no evidence that Dr. U.J. was permitted to perform his services as an anesthesiologist at a time when he did not have a faculty appointment.

¶24        Regarding Dr. E.B., the appellant contends that the administrative judge incorrectly concluded that Dr. E.B. was mistakenly allowed to supervise residents, and he focuses on the testimonial evidence purportedly showing that Dr. E.B. performed surgeries in which he did not supervise residents. PFR File, Tab 6 at 52-53 (referring to his argument at *id.* at 23-27). As the administrative judge correctly noted, Dr. E.B. was hired on a temporary basis because the agency had a "great clinical need," and he was not jointly recruited by the agency and the University. ID at 30-31; *see* HT III (B.C.) at 23. We therefore agree with the administrative judge that Dr. E.B. was not similarly situated to the appellant.

¶25        Our reviewing court, in *Whitmore*, 680 F.3d at 1373, noted that "similarly situated" does not mean "identically situated" to the whistleblower. In *Whitmore*, the court concluded that the two purported comparators, who each had supervisory positions within the same branch of the same department and operated within the same chain of command, were similarly situated to Mr. Whitmore "from an employment position and responsibility perspective." Here, however, the temporary nature of Dr. E.B.'s locum tenens appointment, coupled with the fact that he was hired through a private company, meant that he did not hold a faculty appointment and he was not subject to the same supervision

responsibilities as other physicians, including the appellant, who had held such an appointment.  For these reasons, we conclude that Dr. E.B. was not similarly situated to the appellant.

¶26     For these reasons, we affirm the initial decision as modified herein.

### NOTICE TO THE APPELLANT REGARDING
### YOUR FURTHER REVIEW RIGHTS

The initial decision, as supplemented by this Final Order, constitutes the Board's final decision in this matter.  5 C.F.R. § 1201.113.  You have the right to request the United States Court of Appeals for the Federal Circuit to review this final decision.

The court must receive your request for review no later than 60 calendar days after the date of this order.  *See* 5 U.S.C. § 7703(b)(1)(A) (as rev. eff. Dec. 27, 2012).  If you choose to file, be very careful to file on time.  The court has held that normally it does not have the authority to waive this statutory deadline and that filings that do not comply with the deadline must be dismissed.  *See Pinat v. Office of Personnel Management*, 931 F.2d 1544 (Fed. Cir. 1991).

If you want to request review of the Board's decision concerning your claims of prohibited personnel practices under 5 U.S.C. § 2302(b)(8), (b)(9)(A)(i), (b)(9)(B), (b)(9)(C), or (b)(9)(D), but you do not want to challenge the Board's disposition of any other claims of prohibited personnel practices, you may request review of this final decision by the United States Court of Appeals for the Federal Circuit or any court of appeals of competent jurisdiction.  The court of appeals must receive your petition for review within 60 days after the date of this order.  *See* 5 U.S.C. § 7703(b)(1)(B) (as rev. eff. Dec. 27, 2012).  If you choose to file, be very careful to file on time.  You may choose to request review of the Board's decision in the United States Court of Appeals for the Federal Circuit or any other court of appeals of competent jurisdiction, but not both.  Once you choose to seek review in one court of appeals, you may be precluded from seeking review in any other court.

If you need further information about your right to appeal this decision to court, you should refer to the federal law that gives you this right. It is found in Title 5 of the United States Code, section 7703 (5 U.S.C. § 7703) (as rev. eff. Dec. 27, 2012). You may read this law as well as other sections of the United States Code, at our website, http://www.mspb.gov/appeals/uscode/htm. Additional information about the United States Court of Appeals for the Federal Circuit is available at the court's website, www.cafc.uscourts.gov. Of particular relevance is the court's "Guide for Pro Se Petitioners and Appellants," which is contained within the court's Rules of Practice, and Forms 5, 6, and 11. Additional information about other courts of appeals can be found at their respective websites, which can be accessed through http://www.uscourts.gov/Court_Locator/CourtWebsites.aspx.

If you are interested in securing pro bono representation for an appeal to the United States Court of Appeals for the Federal Circuit, you may visit our website at http://www.mspb.gov/probono for a list of attorneys who have expressed interest in providing pro bono representation for Merit Systems Protection Board appellants before the Federal Circuit. The Merit Systems Protection Board neither endorses the services provided by any attorney nor warrants that any attorney will accept representation in a given case.


FOR THE BOARD: 			_____
					William D. Spencer
					Clerk of the Board

Washington, D.C.

in

*Dennis T. Mangano v. Department of Veterans Affairs*

MSPB Docket No. SF-1221-04-0234-B-9

¶1      I respectfully dissent and would remand this appeal for a determination as to whether the involvement of agency personnel in the faculty suspension process at the University of California, San Francisco (UCFS) constituted a personnel action (i.e., a threat to an appointment) within the meaning of the Whistleblower Protection Act (WPA) under *Mattil v. Department of State*, [118 M.S.P.R. 662](#) (2012), and *Dorney v. Department of the Army*, [117 M.S.P.R. 480](#) (2012).

¶2      This is the third time that this individual right of action (IRA) appeal has been before the Board on petition for review. *See Mangano v. Department of Veterans Affairs*, [109 M.S.P.R. 658](#) (2008); *see also Mangano v. Department of Veterans Affairs*, [104 M.S.P.R. 316](#) (2006). The agency removed the appellant, a part-time staff physician appointed under Title 38, effective May 25, 2001, after 22 years of service with the San Francisco Veterans Affairs Medical Center, San Francisco, based on two charges: (1) failure to hold a faculty position with the agency's hospital affiliate, UCSF Medical School; and (2) misconduct toward other employees. *Mangano v. Department of Veterans Affairs*, MSPB Docket No. SF-1221-04-0234-W-1, Initial Appeal File (W-1 IAF), Tab 5, Subtab 4g. The appellant claimed that the agency removed him in retaliation for his September 1997 disclosures that his supervisor, Dr. B.C., engaged in potentially dangerous animal-human infectious cross-contamination by using surgical equipment in animals and re-use in human patients. W-1 IAF, Tab 1, Subtab H at 4, Subtab I at 5. The appellant also alleged that agency officials further retaliated against him by, inter alia, testifying against him and recruiting other colleagues to testify against him in the UCSF's administrative hearing before its Committee on Privilege and Tenure. *Id.*, Subtab H at 5-6, Subtab I at 7-8.

¶3     In the latest remand decision, the administrative judge found that the appellant established that he made a protected disclosure and that the disclosure was a contributing factor in his removal.  He concluded, however, that the agency established by clear and convincing evidence that it would have removed the appellant based on the suspension of his faculty appointment from the UCSF in the absence of his whistleblowing and, consequently, denied the appellant's request for corrective action.  MSPB Docket No. SF-1221-14-0234-B-9, Initial Appeal File, Tab 15, Initial Decision (ID) at 9-31.  While finding retaliatory animus on the part of Dr. B.C. against the appellant, the administrative judge nevertheless concluded that the agency's decision to remove the appellant was unaffected by it because the suspension of his faculty appointment alone justified the action.  ID at 27-30.

¶4     However, in light of evidence of Dr. B.C.'s alleged retaliatory campaign to "blacklist" the appellant from future employment with the agency, as well as the involvement of Dr. B.C. and other agency personnel in the UCSF's suspension action against the appellant, it cannot be assumed that the suspension was a completely independent and intervening action unaffected by the retaliatory animus.  *See Mattil*, 118 M.S.P.R. 662, ¶ 17 (2012) (although "blacklisting" per se is not an enumerated personnel action under the WPA, broadly construed, it could constitute a failure to appoint).  Thus, under a cat's paw theory, the deciding official's removal decision may well have been tainted by unlawful retaliatory animus.  *See Dorney*, 117 M.S.P.R. 480, ¶¶ 11-13.  I would therefore remand this appeal for further development of the record as to the agency's involvement with the UCSF suspension action.


_____
Anne M. Wagner
Vice Chairman